I will address issues A and B in the brief. The Fifth Amendment issues, Mr. Powell, will address C through F, which were the Fourth, Sixth Amendment issues and the other evidentiary issues that we have. You know that you need to watch your own time. We're not going to do it for you. I do, and we would reserve five minutes, Your Honor. But I mean, as to dividing you, as to dividing between you. I'm sorry? As to dividing between you as well. Correct. Thank you. The First Fifth Amendment issue is the use of perjured testimony. It was the most critical piece of evidence in this case to show how harmful it would have been what if the government could have proven that Vu Nguyen was arrested with a $20,000 watch directly linked to the Las Vegas Chong Hing robbery of $880,000 worth of watches. The perjured testimony was from Pa Dam that a $20,000 watch was on Vu Nguyen's arm, that it was seized by the Garden Grove police, that it was placed, put in police custody, that it was released to him. There is not one single document we proved from either the Garden Grove police department or the Orange County Jail, north or south, where Vu Nguyen was taken. You did not raise this issue in the district court, did you? Yes, we did. We moved to dismiss. Once that testimony was brought forth, we filed the case. On the grounds that it was perjured? On the grounds that, yes. Not that it was perjury, that it was untrue and that they were using this evidence. So we used it in terms of the defense in this particular case, that the motion to dismiss through the grand jury developing this type of evidence, we did not identify it as perjured. We put in the documents showing that it was untrue. And when I brought it up for the motion to dismiss, the judge said, we've already decided that. I don't want to hear anything more about that. So you're not raising it as a prosecutorial misconduct issue. Is that not right? I.e., not only that it wasn't true, but that the prosecutor knew it wasn't true. Correct. As a denial of his right as a fair trial. Yes. And that issue has not been raised. Is that right? It was raised, and it was raised in terms of the motion to dismiss, which was cumulative of various things in the case. That was primarily an issue that the prosecutor knew because the testimony was that Hoddam, the witness, had told them about this two years previously, that they had reviewed the same documents that we had reviewed, and they stipulated and used Officer Echevarria's report, which showed that he did not seize the watch. That's how harmful that testimony was, and that's why that constitutional error is so grave. In addition to that, we had the following testimony, which was tantamount to the witness, FBI agent Worth, testifying that Vu Nguyen was guilty. The prosecutor solicited testimony on the ultimate issue of the case, that there was no evidence that anyone other than Vu Nguyen and Ante Duong were the witnesses to the robbery. That is the ultimate issue. That is in violation of this Court's decision in Harbor. In Harbor, the Court reversed and remanded simply because the case agent's report was put into the jury room, so the jury was able to read it. Here, the damage was even greater. The jury was permitted to hear from the witness stand over objection that the agent  And that is exactly the same thing, because he didn't testify that Vu Nguyen did do it. He just testified that no one else did it. But I don't know. It's not quite the same thing. That is why I said it's tantamount to saying that he is guilty. However, it was – it's a very strange sort of evidence. And what exactly were your objections at the trial for the unnamed? The objection at that time was it wasn't proper in front of the Court. It was a continuing objection for that entire day of testimony. It wasn't proper, though, in what ground? It was hearsay. It was opinion. It was what? That he was vouching. At the beginning of EOR 16, the records of Mr. Wirth, we made an objection continuing throughout the testimony that he was vouching for the witnesses. That is the essence of what he did in the final summation of their case in chief where this arose. And the objection is at 384 through 386 of the EOR where I made that objection. Did you make a hearsay objection? It was hearsay that it was extra record knowledge and he was giving an opinion. And that was the basis of the objection. It came along with the related objections, which we put forth at page 9, that the Asians would flat-out lie to him because they were afraid of losing face in the community, that Asians aren't in a position to cooperate. They don't want to and they tend to omit facts that Asians, this appeal to racial and ethic bias, which comes from the Cabrera case, which this Court said. You didn't make that objection at the trial. We did. We said it was extra record and that it was irrelevant. We made a relevancy objection. There's nothing about the fact that they were Asians which was relevant at all. His experience is not at all relevant. Not when it identifies a racial or ethnic class to say that they tend to admit a lot of facts. What if I were to tell you that when I have Asian witnesses, I omit from my standard charge about credibility that do they look you straight in the eye? Because I have found based on my experience that a lot of Asian witnesses defer to authority and may not look someone straight in the eye and may be still telling the truth. First he would have had to be qualified as an expert, which he was not, on some cultural basis so that we could But now you're assuming that was what he was testifying to. And it makes no sense since his principal witnesses were Asian. Not necessarily what he was doing because he later testified that the insight or the best evidence of the case came from the cooperating witnesses which he was able to do that with. The eyewitnesses who if believed Vu Nguyen would not be convicted, that sort of testimony did not come from him and that was omitted in his summary. And that was clearly evidence that showed that someone other than Vu Nguyen committed this robbery. I mean, you have two eyewitnesses which were dead on that there was a tall robber with a gun and a short robber with a bag. Vu Nguyen and Ante Duong were the exact same height. We prove that by their doctor records in the case of Vu Nguyen. Their case had to show that the eyewitnesses were dead wrong. So it was the witnesses that he kept going back to, that he cut the deals with, the cooperating witnesses that he said gave him the best information. He was opining about their case. It was as if he said, I believe them, trust me, you believe them, which is vouching, pure and simple, in the Ruttgard case, which we cited in the brief. That is the problem with the Fifth Amendment issues in this case. Included in that are witnesses Chong and Liu who were given immunity for perjury during trial when the prosecutor got up in opening statement and gave an opening statement about what. I have three law clerks. I've worked very closely with them for a year. At this moment, I could not tell you who is the taller, the shorter or the middle one. You think this is some great defense? Yes, because if the eyewitnesses had said they were the same size, the government would have used that all the way in that home run, used it all the way through. And you used it the best you can. But, you know, all right. Go ahead, counsel. If we stop believing the eyewitnesses to the crime, let's look at the other folks. You have a guy who was paid $5,000 for his car. He gets a complete walk. You've got a guy who cased the joint, went up there twice. He got a walk. You've got two people who got immunity for perjury. That happens in every case with cooperators. But in every case, we don't have eyewitnesses who are subject to cross-examination on two separate occasions who stand by the fact that what they saw was two people standing together and a robber shorter than Mr. Tam. It's fairly easy for someone to say, as Ms. Hugh said, there was a short robber. How long was the entire operation? Eighty-five seconds, Your Honor. And all she said was there was a tall one and a short one. How short was the short one? He was my height. I can recognize someone my height. I can recognize somebody taller. I can recognize somebody shorter. Mr. Tam was standing right next to me. But you argued this at great lengths to the jury. So the question is the question. This is the harmfulness of these errors in the context. There are constitutional errors under the Fifth Amendment. This would be the harmfulness that the government hasn't proven. It's still a little mystified, to go back to the beginning, about your testimony about Dan or your representation that the prosecutorial misconduct issue with the garage approach was raised at the court, at the district court. We raised it in terms of a motion to dismiss. And we raised it. Yes, on what ground and when? We raised it after his testimony as a motion to dismiss in a continuing motion that went with lieu the use of the grand jury testimony, which is the issue that Mr. Powell will address. But not on the argument you're making now. We did not say that. We said that we cross-examined and we moved to dismiss for the fundamental denial of a right to a fair trial, for all the reasons. We started to make the argument, and the judge said, I ruled I don't want to hear about that anymore now. Thank you. I'll turn it over to Mr. Powell. Thank you very much. Good morning, Your Honor. It's Mike Powell on behalf of Google India. Issue C is the search issue. It seems to me to be fairly straightforward in the sense of the judge allowed us to issue C, Your Honor, whether or not there was the search of, at the 2000 arrest, which ultimately resulted in the address book. All right. Was that issue raised? It was a search issue raised, but not the one you're raising now. That's the only one. But not the one you're raising now, is my understanding. No, it is the exact same point. I thought that your original argument was that the later inventory search was invalid, and now your argument is that the original search of the wallet was invalid. We argued both of those issues to the district court, Your Honor. We presented both. Number one, that the search was not a valid incident search that led to the inventory search. And that's exactly what the judge decided. He decided, number one, that it was a valid search incident to arrest, which it is not, under all the cases that we decided, because they had no probable cause to search the car. The officer testified. They put him on the stand. Their issue was that it was a later inventory search, but it has to be the inventory search. They didn't impound the car. That's where the wallet came from. It did not come from his person. My understanding was from the evidence that the officer saw someone stop the vehicle at a traffic stop. One of the other officers saw someone put something under the seat. That was the passenger, not the driver. That would ultimately turn out to be Mr. Buwen. And then the officer went under the seat to see what it was he put there. Then he pulled out that item. It was a wallet. It wasn't a gun. It wasn't contraband. It was nothing that had anything or he had any reason to seize that. He had no probable cause. He had zip. That's what he testified to. There was nothing there. And so then he searched the wallet, pulled out an ID, and then ran it, and that turned out to be Mr. Buwen. Then he arrested him based on the evidence that he seized from the wallet. Now, this circuit's cases and Civeron's say that you cannot have a valid incident search if that provides the probable cause for the subsequent arrest. That just doesn't work. So once the initial seizure is invalid, then the later seizure of the address book from that is a fruit of that particular search. Have you had standing? We have standing because he was a passenger in the vehicle, and it turned out that it was his wallet. Well, you don't have you have standing not because he was a passenger in the vehicle. Well, Your Honor. But you might have standing with regard to his wallet, only his wallet. Right. Inside the wallet, not picking up the wallet. Did he acknowledge that was his wallet immediately? I don't believe there was, Your Honor, the testimony from that was that officer's testimony was only a few pages. He made no mention of that period, whether or not he acknowledges it was his wallet or not. But that's the problem. The issue of standing was not asserted below. The judge decided. Was the issue that he shouldn't have looked into that wallet at that point at all asserted below? You say it was, but I thought it was not. Your Honor, we asserted both that once we found out what the officer's testimony was, that he didn't have any valid reason to look in that wallet. And that's exactly what we. At that point. Yes, Your Honor. When did he actually find the address book? Was it at that point or later? I think it was later at the jail. But you're only moving to suppress the address book. You're very specific about that. Well, the wallet. What's the problem? Well, because the address book is the only item in there. I understand that. But if you're not complaining about the identity, you're only complaining about the address book. The address book was not gotten at that time. It was gotten later. Right. If they had gotten the identity, which you're not complaining about, they could then have arrested him. Once they arrested him, they could have searched for the address book. So what's the problem? They couldn't arrest him without getting the item, searching the item first. They had to search the wallet first to have any probable cause to arrest him. You're saying you're not challenging. You're very specific in your applied brief that you are not challenging the identity. Well, we don't. In our response, we said we didn't challenge the identity. I mean, in general, you don't have to. You're only challenging the address book. Well, the item seized. The evidence seized, which was the wallet and the address book and the identification inside that item. You are challenging the identity. Well, we're challenging him searching the wallet that gets to the identity. I guess what you're saying is that it was a false arrest, an improper arrest, because they got the information out of the wallet that allowed them to arrest him. And if they hadn't arrested him, then they couldn't have seized his address book. Is that the way it goes? Well, no. What we're saying, Your Honor, is that the search and the seizure was invalid. That's what we're saying. Because they didn't have any reason to arrest the man until he was found. Was there a furtive? Well, that's what they said. And we concede that the officer could have, for officer's safety, looked under that seat to see if that was an item of contraband or something that could have hurt him, namely a gun. Right. And when he looked under there and saw it was a wallet, that's neither obviously contraband, nor is it a gun. So what is he supposed to do with it? Leave it. It's not something that's going to hurt him, and it's not that's a point of view idea. I guess I was totally thrown off by your – by your – the reply for his insistence that you're not challenging the identity. Well, we don't. Well, we didn't ask to suppress the identity, no. We asked to suppress the wallet or the address book and the contents of the wallet. But if you're not suppressing the identity, then presumably you're not asking to suppress the arrest. You're asking to suppress the address book only, which is what you say. Well, we're asking to suppress the fruits of that illegal search. But I guess I'm having a problem. What is illegal? Well, somebody – normally somebody doesn't shove their wallet under the seat when, you know, when the cop is showing up. I mean, what is he – you know, most of us would keep our wallet on us. Well, that – He had no reason to believe that there may be something in there that might be of some relevance. Well, to a traffic stop. He wasn't a driver. And why would somebody shove it under the seat? Well, he's authoritative. Give me an innocent explanation why, if you stop for a traffic stop, you would shove the – Well, I mean, he didn't see that, Your Honor. All he saw was a furtive movement. So – Oh, yeah. So I can rightly say, well, he had a right to go check if it was a gun. It's not a gun. It's an address book. Well, it wasn't an address book. Or a wallet. Or a wallet. And he said, well, why would somebody stick a wallet under his car if he stopped for a police – Well, does that give him probable cause of subject? That's the question. Well, he went and got a warrant, and you went to a magistrate, and you told that story to a magistrate. I think a reasonable magistrate would issue a search warrant. And what would be the crime that the probable cause exists for? Probable cause is that – Putting a wallet under his car. Stopped for a traffic stop. Why would one try to hide his wallet? Well, Your Honor, I can't answer that. That's the reason I believe that there's evidence of a crime there. Well, evidence – but you have to at least have a – The Supreme Court long ago held whether you can have search warrants for evidence alone. It doesn't have to be contraband. Well, I understand that, Your Honor. But it also says in SOTA it says even if the item is laying in – out on the street, they can't – that's what SOTA says. Are you going to address the grand jury question at all? Just this, Your Honor. I mean, obviously, as we said in our reply brief, we've never had access to what the filed ceiling was. All we can say is, is that given the timing of the particular bringing these witnesses, and that would be Kong Nguyen and Vincent Liu, to the grand jury, which at the time we were only two months away from trial, to take – well, as the government says, to take them by surprise when they already had in their pocket a grant of immunity for both of these people, which they – which would indicate they knew they were going to perjure themselves at that time, so they had the immunity there, or assert it, and that's what the statute requires under their own regulations and statutes for granting of immunity in the grand jury. But is it required? Well, they have to have – they have to know that if they're going to assert the Fifth Amendment, they have to reasonably believe that or have other information that they're going to incriminate themselves. They had none. That's just – I'm just saying what the statute said. And they said they never talked to these people or interviewed them or tried to get the evidence. They put them in front of the grand jury under oath. And this was right in the middle of us trying to get Mr. Liu out after three years. It was part of our due process motion. We added that to that. The grand jury abuse came up there. But at that point, we were only two months away from trial. We were four years away from the indictment. And they're still investigating the case. Now, like I said, I have no clue what their ceiling was, but they then put these – I was a little bit confused. How much time was left between the calling of these witnesses and the running of the statute? The what? The calling – The calling of the statute.   The calling of the statute. The statute limitations. Well, I think that if you – the statute limitations in this case that happened in 1999 would have not run until September 14th. I thought a week or two. A week, maybe. Just about. But, I mean, if – to me, it seems like that was – there was no other indictment that came out of that that we know of. Thank you. Your Honor, I have, what, a minute and a half remaining? Your time is – you're a minute over. A minute over. May it please the Court. Good morning. My name is James Hsu, and I represent the United States in this proceeding. The first issue I'd like to address is that brought up by Mr. Kennedy regarding Hondam's testimony. There is no indication that the defendant ever objected to Hondam's testimony being perjury at the time of the trial. There was a blanket request for a dismissal of the case as a result of multiple claims of prosecutorial misconduct, a claim that the grand jury abuse, which had been previously litigated, was improperly ruled upon. Was this mentioned at all? In any guise with regard to the prosecutorial misconduct? The claim of perjury was never mentioned. Was anything mentioned about this testimony of Dan? There were claims that he was not telling the truth, claims that they'd like to dismiss his testimony, but there was never the claim that he had perjured himself, which is very different from not telling the truth. The claim that we've seen – Wasn't it brought out before the jury, the whole business about no documentation? Absolutely. It was brought – in fact, the government stipulated to that fact. And presumably, if they have anything else on this, they can raise it under 2255? They could have. They could, yes. And they can still? Yes. What about the other issue on which there seems to be a difference as to whether it was raised or not raised, and that is the search issue? The search issue that was raised was the inventory search that the defense claimed the agent needed a search warrant to conduct 11 months after he came into possession of that particular document or address book. There was never a claim that the search, the discovery of that wallet – there was never a motion to suppress that evidence. It was – There was never a motion to suppress the wallet, only a motion to suppress the address book as a result of the later inventory search. Correct. The 11-month period between the time the agent received that address book and the time that he ultimately looked at it. What is the justification for that search, however? For the search of the wallet? Yes. In this case, what we have is, in fact, the defendant making a very furtive distinction. And you think that would be probable cause? I think there would be, yes. Probable cause for what? Well, at least to investigate exactly what he put under the wallet. At that point, clearly from the wallet, he can look and see. He can inquire. He could have asked whether or not that was it. Usually in order to get probable cause, you have to have probable cause that he did X, committed X offense. What possible – how possibly could anybody have done that if he had asked for a warrant? Well, there could have been contraband within it. Of what? Can you go to a magistrate and say, I have probable cause to believe that maybe there's contraband of some kind, I don't know what, in this wallet? No, I don't think you could get that. I think you could say there may be evidence of a crime in here. Any crime, without mentioning what crime it is? I could base it upon the fact that it is a wallet and the gesture that was made, yes. Well, but at that point, you would know the identity, is it possible involvement in the crime. All of that would have been in the affidavit and in the affidavit to get the search warrant. I believe that's correct. Inevitably, we would have seen that. So it's not just this in isolation. It's the whole picture of the case and the investigation up to that point. Well, as to later, as to the inventory search, but at the moment, if the complaint is about picking up the wallet and then looking inside it, don't they at that point have to have probable cause at the point they looked inside it of some specific crime? Now, I'm completely thrown off by this reply brief that says they're not challenging the identity. If they're only challenging the address book, which is what I understood, the address book would have come out later anyway, and I'm not sure what difference it makes. But just looking at the moment that they looked in that wallet, what was the justification for doing it? Looking to find out who this person was, Your Honor. And that's what we argued. Well, did they ask him who he was? It's not clear that they did. No. It's not clear from the record that they did. Yeah. They saw that the wallet was down below beneath him. They looked at it. They would have been – and I would submit that the officers would have been allowed to inquire, to identify this individual. And as we know from this trial, the defendant had previously been stopped by law enforcement, and in those situations, he had given false names. He had misrepresented who he was. But we're looking at this particular instance. They didn't apparently ask him who he was. They looked in the wallet. No. But I would submit that as soon as he made that gesture, putting his wallet below, they eventually, they inevitably would have inquired as to who he was and attempted to identify him. And they would have done it through either his responses, which would have been truthful, in which they would have found out that he had a warrant for arrest, or they would have been untruthful, in which they would have determined that he was, in fact, not – that he probably had information about who he was in that wallet, which was directly beneath him. Well, let's turn to something else. I'm quite troubled by the testimony of the investigator, Mr. Wirth. Ordinarily, if the investigator gets on the stand, he says, well, I found X, and I saw Y. Correct. Here, all he does is tell us how he went about investigating this case and about all of the other robberies around, which I guess were supposed to prove the conspiracy. It was, and it was offered also by the defense. You'll note in the opening statement of the defense, they put up a chart of the California indictment indicating the crimes that Ante Duong had participated in. They wanted to make it perfectly clear, one, that their client, who was charged with the Las Vegas offense, was not involved in any of these other crimes. They also put it up there for the reason we did, to create a timeline, to give a point of reference, because many of the witnesses in this case participated in crimes or took the point of reference from when a crime occurred and when they heard about it. Yes, but when Agent Wirth got up and said, I – it was their – did you find any evidence that anybody other than these two people did the crime? And he said, no. That has to be hearsay, because the only way he could possibly be saying that, either that or he didn't investigate. In other words, either it's without foundation, because he actually did nothing, or he did something. And if he did something, what was the something? He went and he asked people. He couldn't possibly be a precipitant witness. And the notion that testifying to no evidence is a fact does not make – makes very little sense to me. In the context of this case, the defense's theory was a case of mistaken identity. Someone else other than the defendant committed the crime. Correct. Sure. The evidence was he was much shorter. And you could ask Agent Wirth, I suppose, you know, did you see, you know, so-and-so committing the crime? Did you – and maybe there are circumstances with admissions of various kinds. You could ask him whether he asked people things. But this was not of that variety at all. It was, A, a conclusion. B, with no stated foundation. C, had to be based on hearsay. What else could it be based on? I don't disagree that it had to be based on hearsay, Your Honor, but I would submit to you, but that is exactly the question that was posed to this witness. As I indicated, Government's Exhibit 55, which was referenced to in posing this question, was a compilation of individuals who associated regularly with Ente Duong, some of whom were our witnesses, some of whom were known to have participated in criminal activity with Ente Duong. The defense had offered photographs of those individuals to say, look, these people were involved in crime with Duong. As well, they are shorter than Duong. He got out that testimony as well. So the question posed to the witness was, with respect to Government's Exhibit 55, except for Duong and the defendant, did you develop evidence that anyone else committed these crimes? It was in direct response to the claim that it had to have been someone else within the group of individuals that was brought into question by the defendant. Well, what he was really saying was, I talked to a lot of people, and what they told me filtered through my mental processes. I concluded that there wasn't any evidence. That's the only thing he could have been saying. But is that a legitimate thing for him to say on the witness stand in terms of the fact that he could only have been saying, giving his conclusion with regard to a bunch of hearsay? That's all he could have been doing. I think he could have. I think you're absolutely right. On what ground? Pardon me? On what basis can he do that? On the fact that the defense has the opportunity to then cross-examine him on it. And the fact that his statement was totally hearsay doesn't mean anything. It doesn't matter. He could have objected to it, which he did on the basis of foundation only. All right. Well, there was a foundation problem, wasn't there? Yes. Well, I don't believe that there was, because we don't have any idea whether he – the impression was created to the jury that he had actually looked into this. But what he literally said does not prove that he looked into it at all. It only proves that he didn't develop any evidence. That's correct. But then the defense would have had the opportunity to cross-examine him on that very  But what is the purpose of the foundation rule to begin with? Well, that objection was overruled by the district court judge. Maybe the district court judge was wrong in overruling that. That's what we're looking at now. Overruling of the objection. But what the contention is, is that this was an opinion as to guilt. And I think that's what we have to focus on. When you look at the example that they bring up. And you don't think it came across to the jury as essentially that? No, I do not. Because, again, it was nothing like what happened in Harbor, where you actually had an opinion as to the defendant's guilt. This was never a comment. Well, you have an opinion as to the defendant's defense, at least, right, which is his defense is wrong. Or that I've looked into the defense. The claim was the attack was on the investigation. The defense's claim was the government put on blinders in conducting this investigation and did not. And should have looked at all these other people. Correct. So it was.  That's what they were trying to convey. And perhaps the better argument for you is simply, you're just trying to counter it, although I would have been more comfortable if you waited for redirect to raise that point. Point well taken, Your Honor. But that was the reason for asking that question. It was in direct response, very tailored to the individuals who were brought into the picture by both the defense and the prosecution as individuals who associated with Don. It wasn't even actually. Pardon me? Actually, I don't think it was. It wasn't the question, did you find, did you develop evidence of any other person other than these two people? No, it was not. What it says is, with respect to Governance Exhibit 55. Well, there was another question and answer which. I think his responses were, I never developed evidence that anyone other than Don and the defendant committed the crime. I think the answer was much more broad than the specific question which I had posed. This case is very troubling in that they had this fellow in jail for years and they never could really develop any direct evidence that he was the one. Isn't that what was happening? So the government comes to trial with a case where its evidence is rather weak and they try to bolster it by having Worth, in effect, vouch for his being guilty. Your Honor, I disagree that the evidence in this case was weak and that it was developed on the eve of trial. Bach went, and this is typical in cooperator cases, you, and co-defendant cases where you indict a number of individuals. Oftentimes you're indicted. An individual defendant will plead guilty with the hope of cooperating with the government, providing information about criminal activity of his co-conspirators and co-defendants in hopes of getting a reduced sentence. He'll do that. That's why oftentimes this evidence is developed later after indictment. There's nothing questionable about that. The fact that we then – and I think you're alluding to the grand jury investigation. In part. In part. With respect to the grand jury investigation, what we were focusing on, as we indicated in our sealed filings, was that we had a purpose of continuing an investigation into other crimes and other individuals who were engaged possibly in criminal activity. That was what we were focused on. That was what we were looking at. The fact that the primary purpose was to further – was to continue an investigation of other individuals who we thought might have been involved. There was a great deal of hearsay in this case of talking about what Gong had said and not any direct testimony from him. Is that correct? Anh The Duong? Mm-hmm. Yes, that's correct, because he is charged in California. And what – But it seems to me that those are all Crawford violations. They are not, Your Honor. They're non-testimonial. They were provided – they're in a – they don't implicate the Confrontation Clause. What about the statement of the voluntary – the statements of confessions of Duong? What about that? I think those are what Judge Fletcher was referring to. Yes. Those where Duong says, in talking to Luan, I just committed – No, no, no. I thought he talked to government agents at some point. He did. He said he telephoned Special Agent Wirth. And this came up in – redirect to Special Agent Wirth. After the defense had put on their one witness, Cindy Hong, the former girlfriend of Duong, who indicated that Duong had called her and said, one, don't believe anything you'll hear. I didn't do it. And then, two, he said, hey, they got the wrong guy. And then what we did – referring to the defendant is what Cindy Hong testified to. And then finally, what we did is we put on testimony from Special Agent Wirth in which Duong, after being directed not to contact the agent, called him to say, hey, I'd be willing to plead guilty if you would let one of my particular co-conspirators go. And it was not the defendant. So that statement was on. So what is your argument about that in Crawford? Is it that it's not – wasn't harmful or that it wasn't covered by the Confrontation Clause? I don't think it falls within the category of – Well, why not? Why? Because it was just, as we indicated in citing Davis v. Washington, the recent Supreme Court case that came out in June. Doesn't Davis have a footnote specifically saying that lack of interrogation is irrelevant or may be irrelevant? With what? That the fact that there was or wasn't interrogation isn't the point? That's correct. So there wasn't interrogation, but it certainly was made to an officer as a past account of a crime. So what's the issue? Yeah, there's a – there – in Davis, what they said is there are situations where there can be statements made to law enforcement, and I don't think it was all-inclusive, where those statements would be non-testimonial. Examples of that were statements made in an emergency setting for purposes of identifying an individual who was potentially harming the declarant or the declarant. But are you saying that if somebody calls up an officer and says, I want to confess, here I am, I'm now confessing, I did the crime, that that's not testimonial? If I say I did the crime, yes, I think it is testimonial. So why – exactly why isn't this testimonial? Why are you conceding that? That I did the crime. Why are you conceding that? I don't think Crawford means with that. I mean, the whole point of Crawford is you don't want to let in evidence which is really being developed for law enforcement purposes. Correct. When someone calls up after being told not to and the con calls you up and makes statements. I'm sorry. I misunderstood your question. And I thought it was only being offered. Furthermore, I thought it was only being offered for impeachment purposes. It was. To contradict what the lady said. Well. That is correct. And I apologize because I did misunderstand your question. To me, what's wrong with it, the reason why it's probably not a problem is because he actually said nothing about Wynn in the end. That's true. He didn't say yes or no. He just said nothing about him. That is correct. He did not. It's only what he said about him that's wrong. I mean, he said Beach, the Wyntons. Right. About himself. Okay. Go ahead. With respect, unless the Court – does the Court have any other specific questions that it wants to point to? Otherwise, I can touch on some areas. Go ahead. All right. I would like to address the claim that there were improper references to race in this case. The background of this case was that this particular agent had to interview a number of individuals during cross-examination. And in the defense case, again, the accusation or the claim or the implied defense was that because these witnesses were interviewed on multiple occasions and because sometimes their statements varied from one interview to the next, they were necessarily lying. And the defense went so far as to say, in some cases, making – in looking at specific statements that were made by the witnesses and pointing to the fact that, well, as we indicated in our brief, you said you met so-and-so on this date when, in fact, you had not. There was a misunderstanding in interviews that the agent conducted with respect to certain words that he used. Because a number of these witnesses are of Asian descent and when he encountered them, he did, in fact, run into certain cultural barriers that he had problems with in conveying exactly what he meant and then properly recording without misunderstanding what they had said to him. And it was in direct response to the defense's claim that, oh, no, no, this one interview differs so dramatically or differs from this next interview that they necessarily were lying from this one interview to the next. That's why that question was posed. It was posed to address that issue which came up repeatedly because, in this case, many of the witnesses who the agent interviewed were of Asian descent. I would point to the claim that there was impermissible generalization about race for the purposes of convicting this particular defendant because he is of Asian descent. That was not what was done in this case. There was absolutely no connection between the statements that were made about the defendant because of his race being more likely to have committed this particular crime. There's nothing to indicate that. That statement was never made directly. It was never implied. We did nothing of that type. The agent was merely commenting on the difficulty. At the very least, it would be better to avoid this sort of stuff. The same point could have been made without referring to race, it seems to me. I don't disagree that the – that it could have been addressed in a different way, but because it had also been brought up by the defense. A lot had been brought up by the defense. Difficulties with language, for example, had been brought up by the defense. This wasn't really about difficulties with language, as I understand it. It was, Your Honor. I thought it was pointed to cultural differences, not the fact that the questions weren't being understood verbally, but they weren't being understood culturally, was the argument. Or more than that, that there was a cultural tendency to not tell what you knew quite aside from understanding things. That was part of it. As well, there were language barriers that the agent encountered, as he indicated as he testified. Well, the language barriers would be fine, but it did go beyond that. Yes, it did. But it did go to explain why there were those particular cultural barriers, in which the witnesses did not want to speak to law enforcement, in which they specifically said that they thought they would lose face if they were to cooperate within their community, if they were to cooperate with law enforcement. It was to flesh out that fact and the fact that these witnesses were not necessarily lying every time that they had to be interviewed by this particular agent. Well, I thought it was to say that they were lying, but that there were reasons they weren't. That was not a statement that they were lying. It was a statement that they were lying. With respect to some of those witnesses, yes, which, in that case, was cumulative because those particular agents, Kong, Liu, and Luan, all admitted on the stand, as well as Bok-Wen, that, yes, when they were ---- The point of the testimony, as I understood it, was that these people, because of their ethnic background or cultural background, do have more of a tendency to lie, and, therefore, we have to go at them, we have to deal with them more, and in a certain way. That was the testimony. That's correct. So it's not that they weren't lying. It's that they were lying. That they were lying. And if anything, that hurt the government's case, not the defendant's. All of the cooperating witnesses in the government's case are of Asian descent. There was nothing to tie the defendant's ethnicity to the crime that was committed. Thank you very much. Thank you. Thank you for your useful argument. I wonder if both of you, I'll give you one minute to say something important. Just on the last Asian thing, the whole point of it was that they lied to me, they lied to me, and I was the one that finally got the truth out of them, and everything they told you was the truth. That is just plain and simple. So you're relying more on vouching than on the ethnic issue. Well, both of them. It's vouching, and there was also attack, but, I mean, it's an attack. It's a vouching within an attack. I'm the arbiter. I decided I had to keep going back and keep going back and confronting them with facts until they finally told me the truth, which is what you heard on the stand here. That's plain and simple invading the jury prerogative. It's vouching. Plain and out. And, in fact. I'm sorry. Which point is this addressing? We're talking about Agent Worth. And, in fact, Your Honors, before he was on the stand slightly at the last of one day when we objected to testimony or questions, well, what was it that broke the case for you? In other words, what decided that you could go indict Vu Nguyen? We objected to that the next very morning before we even started. Maybe I'm – are you talking about the fact that he brought out the lying or is it the Asian aspect? Both of it, Your Honor. He's saying they're lying because they're Asian. I mean, I hardly remember a case with cooperators who didn't lie initially. Well, Your Honor, do you get to tell them that they're lying? Well, two things. That they're lying because they're Asian. And then I got the truth out of them, so you better – you should believe them. I mean, that's what he told them. Okay. Thank you very much. Thank you, counsel, for a useful argument. The case of United States v. Nguyen is submitted.
judges: B. Fletcher, Berzon, Trager